UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


**LORENA CHAVEZ-ACOSTA,**
        **Plaintiff,**


**vs.**                                                   **12 CV 353 JAP/CG**


**SOUTHWEST CHEESE COMPANY, L.L.C.,**
        **Defendant.**


MEMORANDUM OPINION AND ORDER

Defendant Southwest Cheese Company, LLC (SWC) asks the Court to dismiss all

remaining claims asserted by Plaintiff Lorena Chavez-Acosta (Plaintiff) in her FIRST

AMENDED CIVIL COMPLAINT (Doc. No. 6). *See* DEFENDANT SOUTHWEST CHEESE

COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 35) (Motion).[1]  Because

there are disputed fact issues on Plaintiff's claims of sexual harassment resulting in a hostile

work environment, the Court will deny the Motion in part as to those claims.  The Court will

grant summary judgment in part as to the claims brought under New Mexico law.

_____

[1] In ruling on the Motion, the Court has considered PLAINTIFF LORENA CHAVEZ-
ACOSTA'S RESPONSE IN OPPOSITION TO "DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT" (Doc. No. 36); and DEFENDANT SOUTHWEST CHEESE COMPANY'S
REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Doc. No. 40) (Reply).  In
addition, the Court will grant in part and deny in part DEFENDANT SOUTHWEST CHEESE
COMPANY'S MOTION TO STRIKE AFFIDAVITS (Doc. No. 41) after considering
PLAINTIFF LORENA CHAVEZ-ACOSTA'S RESPONSE TO "DEFENDANT SOUTHWEST
CHEESE COMPANY'S MOTION TO STRIKE AFFIDAVITS" (Doc. No. 45); and
DEFENDANT SOUTHWEST CHEESE COMPANY'S REPLY IN SUPPORT OF MOTION
TO STRIKE AFFIDAVITS (Doc. No. 49).  In the ruling memorialized in this Memorandum
Opinion and Order, because the Court will grant in part SWC's motion to strike affidavits, the
Court has not considered any stricken statements as evidence.

1

I.  Background [2]

SWC is a producer of cheese and dairy whey products. (Mot. Ex. A Earnest Loveless Aff. ¶ 4.)  SWC is located in Clovis, New Mexico, has more than 300 employees, and operates 24 hours per day, 7 days per week. (*Id.* ¶ 6.)  The hourly cheese production employees are organized into shifts that report to Cheese Team Leaders, and the Cheese Team Leaders report to three Production Managers. (*Id.*) The Production Managers ultimately report to the Cheese Plant Manager. (*Id.*)  In the "whey department," hourly production employees report to Whey Team Leaders, who report to the Production Managers, who report to the Whey Plant Manager. (*Id.* ¶ 7.)

Plaintiff is an Hispanic female. (Am. Compl. ¶ 50.) Plaintiff began working as an hourly cheese production employee at SWC in February 2009 and became a full time non-probationary employee in May 2010.  (*Id.* ¶¶ 9- 10; Chavez-Acosta Aff. ¶ 2.)  Plaintiff  "was at all times qualified to perform her position" at SWC. (Am. Compl. ¶ 53.)

Brenda Miller (Miller) was SWC's Human Resources Director. (Miller Aff. ¶ 2.)  Cody Stewart (Stewart) was an Assistant Team Leader at SWC. (Macias Aff. ¶ 3.) Chance Senkevich (Senkevich) was an SWC employee who trained production employees. (Miller Aff. ¶ 25.)

Plaintiff began her employment on the "cheese side" of the plant, but was transferred, with a pay increase, to the "whey side" of the plant during the last two months of her employment. (Chavez-Acosta Aff. ¶ 3.)  Plaintiff was assigned to the whey "separator room," which she contends was "the hardest part of the plant to operate." (Chavez-Acosta Aff. ¶ 13.)

---

[2] This statement of facts is a description based on undisputed factual allegations in the Amended Complaint, and admissible evidence set forth in the briefing on the Motion viewed in the light most favorable to Plaintiff, with all reasonable inferences from the record drawn in her favor. *See Clanton v. Cooper*, 129 F.3d 1147, 1150 (10th Cir. 1997).

Senkevich was originally assigned to train Plaintiff, but Plaintiff contends that she was not properly trained to perform her job on the whey side of the plant. (*Id.*)

SWC has a policy prohibiting discrimination and harassment, particularly sexual harassment. (Miller Aff. ¶ 3.) SWC's policies are printed in the Employee Handbook received by all of SWC's employees. (*Id.*) When employees are hired, they must sign an acknowledgment that they read and understood the provisions of the Employee Handbook. (*Id.*) In addition, SWC's anti-discrimination and anti-harassment policies are posted throughout SWC's facility and employees must undergo annual training on how to avoid discrimination and harassment. (*Id.*)

SWC states that it employs each of its production employees on an "at-will" basis, which allows either SWC or the employee to terminate the employment relationship at any time. (Miller Aff. ¶ 4.) The "at-will" policy is printed on SWC's employment application, and all applicants acknowledge this policy by signing the SWC employment application. (*Id.* at ¶ 5.) In the acknowledgment, employees are also informed that the "at-will" employment status can only be changed by the President/CEO by written contract. (*Id.*) The "at-will" policy is also printed on the offer letter received by prospective employees and in the Employee Handbook. (*Id.*)

### A. Allegations Against Cody Stewart

Plaintiff describes an incident that occurred during working hours in October 2010 in which Stewart, an Assistant Team Leader, exposed his genitals to Plaintiff twice on the same night. (Chavez-Acosta Aff. ¶ 27.) Plaintiff alleges that during the remainder of her employment at SWC, she was afraid that Stewart would again expose himself to her. (*Id.* ¶ 12.) One other female employee, Yvonne Macias (Macias), testified by affidavit that Stewart exposed himself to her in June 2009 at SWC. (Macias Aff. ¶ 3 Resp. Ex. 2.) Neither Plaintiff nor Macias

complained to SWC about these incidents during their employment. (Miller Aff. ¶ 14.)  Macias
testified that "she was well aware that Cody Stewart had a habit, and routine of exposing his
genitals to female employees at [SWC]." (Macias Aff. ¶ 3.)  Plaintiff testified by affidavit that
"[i]t was well known in the SWC plant that Cody Stewart had a disturbing habit of exposing his
genitals to female employees." (Chavez-Acosta Aff. ¶ 27.)

>   Plaintiff recounted another disturbing incident involving Stewart:

>   One time Cody Stewart took me upstairs (in an area off limits to employees), allegedly
>   for "training."  He took me to a utility room, where he made me stand in the dark with
>   him for several minutes which made me extremely uncomfortable. . . . I asked him what
>   are we doing up here. He did not respond. I sensed something was not right. I did not
>   complain to Human resources Manager Brenda Miller because I had already attempted
>   and she had upset me and did not believe me. There was no way to access this area
>   without an access card.

 (Chavez-Acosta Aff. ¶ 28.)  Plaintiff has not indicated when this incident occurred.

>   B.  Allegations Against Chance Senkevich

On February 14, 2011 in the SWC parking lot, Senkevich offered Plaintiff a box of
chocolates and roses and asked her for a date. (Chavez-Acosta Aff. ¶ 14.)  Plaintiff said she was
not interested in a relationship with Senkevich. (*Id.*)  Plaintiff contends that after she rejected
Senkevich's offer of a date Senkevich's behavior changed: (1) he "stalked" her around the SWC
plant; (2) he used his cell phone to take photographs of Plaintiff at the SWC plant, in violation of
SWC's work rules; and (3) he "sabotaged" her work so her "product would not meet
specifications." Plaintiff elaborates on the ways that Senkevich sabotaged Plaintiff's work
performance:

>   (1) Senkevich switched "the blue sticker labels off the fine boxes, making it look like a
>   mess requiring [Plaintiff] to fix it.  The box would have so much whey in it it [sic] would
>   flip over and make a mess" (Chavez-Acosta Aff. ¶¶ 35 (i)-(iv))
>   (2) Senkevich, "took off the screen on the fine (which is part of the cheese), saver on
>   purpose. This made all the fines fall down heading back to the clarifiers and separators

and clogging them up. [Plaintiff] would have to take the clarifier apart and take the fines out by hand." (*Id.* ¶ 15(iii).)

(3) Senkevich showed Plaintiff illegal "tricks" such as "while [Plaintiff] was doing the flush on the pasterizer [sic] (HTST), [Senkevich] said if [Plaintiff] changed the PSI (pounds per square inch), I would get done CIPing (cleaning in place), faster, when in reality this would cause the sealers to blow off causing down time." (*Id.* ¶ 35(vi).)

Plaintiff generally asserts that Senkevich "would pick on me constantly." (*Id.* ¶ 35(viii).)

Senkevich "would not address [Plaintiff] by her name but would say loudly and rudely 'hey you' or 'hey.'" (*Id.* ¶ 35(xi).)

### C.  Plaintiff's Report and SWC's Investigation

On June 6, 2011, Plaintiff formally reported Senkevich's behavior to Human Resources Director Miller. (*Id.* ¶¶ 13, 25; Miller Aff. ¶ .)  However, Plaintiff asserts that she "complained about Chance Senkevich to multiple management employees between February 14th, 2011 and June 6th, 2011.  His constant retaliatory and harassive [sic] behavior created unbearable stress and caused and continues to cause me sleep problems and caused my personality to change." (*Id.* ¶ 16.)

Between June 8 and June 17, 2011, Miller and Chuck Herrington (Herrington), a Production Manager, investigated Plaintiff's June 6 report. (Miller Aff. ¶ 8.)  Miller and Herrington interviewed several employees about Senkevich's behavior toward Plaintiff. (Mot. Ex. A-9 Miller's Notes.)  The employees revealed some inappropriate behavior: (1) Senkevich complained about Plaintiff's inability to do her job to other employees; (2) Senkevich was short and impatient with Plaintiff and did not properly coach her; (3) Senkevich was seen hiding gaskets needed for the machines, but he was reprimanded by another employee; and (4) Plaintiff and Senkevich did not work well together and had petty differences. (Miller's Notes Resp. Ex.

1A.) [3]

Miller and Herrington concluded that although Senkevich and Plaintiff had problems working together, it did not appear Senkevich was deliberately sabotaging Plaintiff's work. (Miller Aff. ¶ 10.)  Based on the "friction" between Plaintiff and Senkevich, Miller decided to separate Plaintiff and Senkevich. (*Id.* ¶ 11.)  Miller assigned Herrington and Kevin Cobian (Cobian), instead of Senkevich, to continue training Plaintiff. (*Id.*)  Miller verbally counseled Senkevich to be more patient and to work on more "effective methods of teaching." (*Id.*)  Miller told Plaintiff "that it might be appropriate to bring another employee into conversations that she needed to have with Senkevich[.]" (*Id.*)  Plaintiff was instructed to talk to Miller if Plaintiff had any future problems. (*Id.*)  Miller told Herrington and Justin Musick, a Production Manager, to monitor Plaintiff's interactions with Senkevich and to report any issues.  (*See generally*, Miller Dep. Mot. Ex. D pp. 63-65; Miller Aff. Mot. Ex. B at ¶¶ 7, 9-11 .)  "Plaintiff did not make any other complaints of sexual harassment to Human Resources while she was employed at SWC." (Miller Aff. ¶ 12.)  Miller's handwritten notes indicated the names of each employee Miller and Herrington spoke to and outlined what the employees said about Senkevich's conduct toward Plaintiff. (Miller Notes Resp. Ex. 1A.)

Plaintiff complains in her affidavit that Miller did not talk to any "cheese side" employees and that these employees "knew about the retaliatory harassment." (Chavez-Acosta Aff. ¶ 17.)  Plaintiff further states that "[w]hen I reported sexual harassment to Brenda Miller it made things worse for me. Chance Senkevich (a white male), made things worse for me as a

---

[3] Senkevich was terminated on October 5, 2011 for threatening to contaminate product and threatening other employees by saying he was going to "taze" them.  (Resp. Ex. A2.) Previously, Senkevich had been disciplined twice for attendance and once for verbal abuse of an employee. (*Id.*)

result of my complaint. He retaliated against me by becoming more aggressive. He spread

rumors that I was trying to making [sic] him look bad to Human Resources." (*Id.* ¶ 6.)

### D.  Plaintiff's Resignation, NMHRA Charge and Lawsuit

On July 18, 2011, Plaintiff resigned her employment at SWC but did not indicate that she

was resigning due to sexual harassment. (Am. Compl. ¶ 11; Miller Aff. ¶ 13.)  Plaintiff claims

that while she was employed at SWC, she endured intolerable sexual harassment by Senkevich

and Stewart.  (Am. Compl. ¶¶ 18, 53.)  On June 29, 2011, Plaintiff filed a charge with the New

Mexico Department of Workforce Solutions, Human Rights Bureau, which issued an order of

non-determination on March 7, 2012. (Am. Compl. Ex. 1.) On March 14, 2012, Plaintiff filed an

appeal of the order in the Ninth Judicial District Court, Roosevelt County, New Mexico.  The

case was removed to this Court on April 5, 2012.  On August 3, 2012, Plaintiff's retaliation and

42 U.S.C. § 1981 claims were dismissed. MEMORANDUM OPINION AND ORDER (Doc. No.

13). Plaintiff is asserting these remaining claims: (1) sexual harassment resulting in a hostile

work environment in violation of NMSA 1978 § 28-1-7(A);[4] (2) sexual harassment resulting in a

hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2(a);[5] (3) breach of

---

[4] It is an unlawful discriminatory practice for:

A. an employer, unless based on a bona fide occupational qualification or other statutory
prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in
matters of compensation, terms, conditions or privileges of employment against any
person otherwise qualified because of . . .sex[.]

[5] It shall be an unlawful employment practice for an employer–

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate
against any individual with respect to his compensation, terms, conditions, or privileges
of employment, because of such individual's . . . sex . . . [.]

contract; (4)  intentional infliction of emotional distress; and (5) negligent supervision. (Am.

Compl. at 6-14.)

II.  Discussion

A.  Summary Judgment Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  When applying this standard, the Court examines the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing summary judgment.

*Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

The party seeking summary judgment bears the initial burden of "show[ing] that there is an

absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin*

*Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted).  Once the

movant meets this burden, Rule 56 requires the non-moving party to designate specific facts

showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

(1986).  In considering a motion for summary judgment, then, the Court's "role is simply to

determine whether the evidence proffered by plaintiff would be sufficient, if believed by the

ultimate factfinder, to sustain her claim."*Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th

Cir. 2002).

B.  Claims of Sexual Harassment Hostile Work Environment Under Title VII and
the NMHRA

The same legal and evidentiary standards apply to claims brought under Title VII and

NMHRA; thus, the Court will discuss the claims together. *Ulibarri v. State of New Mexico Dep't*

*of Corrections Acad.*, 2006 -NMSC- 009, ¶ 11, 139 N.M. 193, 131 P.3d  43.  Under Title VII, 42

U.S.C. § § 2000e-2(a)(1) and under NMSA 1978 § 28-1-7 (A), it is unlawful to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of the individual's sex.  Sexual harassment is a form of discrimination that is prohibited under Title VII and the NMHRA. *See Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  An employee can claim sex discrimination based on a hostile work environment if the employee can show that she was discriminated against because of her gender and that the discrimination created an abusive environment and was severe enough to alter the conditions of her employment.  *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012).  Sexual harassment from a hostile work environment occurs when the offensive conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65.

Plaintiff, as a female, is a member of a protected class, and Plaintiff has presented evidence that she was subjected to unwanted harassment from both Senkevich and Stewart. Although most of  Senkevich's conduct was not overtly sexual, "any harassment or other unequal treatment of an employee which would not occur but for the sex of the employee may comprise an illegal condition of employment under Title VII." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987). *See also Robson v. Eva's Super Market, Inc.,* 538 F.Supp. 857, 861 (N.D. Ohio 1982) (finding that assignment of more onerous tasks to female employee after employee resisted supervisor's advances was sufficient evidence of sexual harassment to withstand summary judgment).  Viewing the evidence in favor of Plaintiff, the Court finds that Plaintiff has presented a fact issue and inference that Stewart's and  Senkevich's inappropriate behavior would not have occurred but for Plaintiff's sex. *Id.*

To determine whether the harassment was sufficiently severe or pervasive, courts

9

consider, "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007). "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Hicks*, 833 F.2d at 1413. In this analysis, a court should consider whether the evidence shows a sexually hostile work environment by examining "all the circumstances from the perspective of a reasonable person in the plaintiff's position." *Semsroth v. City of Wichita,* 304 Fed. Appx. 707, **7 (10th Cir. 2008) (unpublished opinion) (citations and quotations omitted). This inquiry is particularly unsuited for summary judgment "because it is quintessentially a question of fact." *Id.*

The Court finds that although Stewart's conduct should not be considered pervasive, the conduct was sufficiently severe to create a hostile work environment because it was physically threatening and sexually abusive. *See Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243-44 (10th Cir. 2001) (holding that single sexual assault incident was sufficiently severe to constitute a hostile work environment).

As for Senkevich's behavior, SWC argues that it was insufficiently pervasive to create an abusive work environment. SWC points to a case in which the New Mexico Supreme Court upheld the grant of a defendant's motion for summary judgment. In *Ulibarri*, 2006 -NMSC- 009, 39 N.M. 193, 131 P.3d 43, the New Mexico Supreme Court held that a supervisor's repeated verbal propositions to the plaintiff for a sexual relationship over a two month period was not sufficiently severe or pervasive to support a hostile work environment type of sexual harassment claim. *Id.* ¶ 12. The court stressed the requirement that the work environment must be "both

objectively and subjectively hostile" and that the environment must be "one that a reasonable person would find hostile or abusive and one that the employee did perceive as being hostile or abusive." *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citing *Nava v. City of Santa Fe*, 2004–NMSC–039, ¶ 13, 136 N.M. 647, 103 P.3d 571 (quoting *Faragher v. Boca Raton*, 524 U.S. 775 (1998)).

In contrast, the New Mexico Supreme Court reversed a summary judgment for the defendant in *Ocana v. American Furniture Company*, 2004 -NMSC- 018, ¶ 25, 135 N.M. 539, 91 P.3d 58. In *Ocana*, the New Mexico Supreme Court noted that the district court improperly focused on the credibility of the plaintiff's testimony:

> She described how he would always follow her around, including to the restroom. She said he would approach her when she was alone, stare at her, and touch himself in a sexually suggestive manner. He would also stand near her and stare at her breasts. He usually had an erection when she saw him and he rubbed up against her with an erection on one occasion. He would park next to her car even though he had a designated parking area. He would appear out of nowhere when she went into the warehouse. She said his behavior made her feel uncomfortable. She also said his presence affected her performance at work, and there was evidence that her work performance was poor.

*Id.* The court concluded that the plaintiff had presented sufficient evidence to deny summary judgement on her claim of hostile work environment sexual harassment. *Id.*

Although this is a close case, the Court finds that summary judgment is not appropriate on Plaintiff's claim of sexual harassment based on Senkevich's conduct. Plaintiff's evidence that Senkevich daily subjected Plaintiff to verbally abusive behavior and that Senkevich sabotaged Plaintiff's work performance could support a jury's finding that Plaintiff experienced a hostile work enviornment. Senkevich's daily conduct comes within the common meaning of pervasive, and Senkevich's sabotage conduct certainly affected the terms and conditions of

Plaintiff's work, and if allowed to succeed, could have resulted in Plaintiff's termination from employment.  Hence, Plaintiff has succeeded in illustrating a disputed fact issue as to whether Senkevich's conduct created an abusive, hostile work environment based on sexual harassment. *Robson,* 538 F.Supp. 857, 861 (N.D. Ohio 1982) (finding that assignment of more onerous tasks to female employee and verbal abuse after employee resisted supervisor's advances was sufficient evidence of sexual harassment to withstand summary judgment).

### 1. *Farragher/Ellerth* Defense

An employer may be liable for its employee's sexual harassment of another employee under two theories: (1) vicarious liability; and (2) negligence.  *An v. Regents of the Univ. of Cal.*, 94 Fed. Appx. 667, 675 (10th Cir. 2004).  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  In other words, a court may presume that an employer is liable "where there is actionable sexual harassment and the harassing employee has supervisory authority over the victimized employee." *Ocana v. American Furniture Company*, 2004 -NMSC-018, ¶ 26, 135 N.M. 539, 91 P.3d 58.  Both Senkevich and Stewart were part of the supervisory hierarchy at SWC; so this element is met in this case.

An employer may escape vicarious liability for its supervisor's behavior, "[w]here no tangible employment action has been taken against the employee" if the employer establishes both elements of the *Farragher/Ellerth* affirmative defense. *Id.*; *See Loya v. Wal-Mart Stores East, LP*, 669 F. Supp. 2d 1266, 1284 (D. N.M. 2009) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and *Faragher v. City of Boca Raton, Fla.*, 524 U.S. 775, 807 (1998)). An employer asserting this affirmative defense must prove by a preponderance of the evidence

that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Loya*, 669 F. Supp. 2d at 1284. And, an employer must show that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

"[T]he existence of a valid sexual harassment policy is an important consideration in determining whether an employer acted reasonably to prevent sexual harassment." *Kramer v. Wasatch County,* 857 F. Supp. 2d 1190, 1208 (D. Utah 2012) (citing *Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011)). An employer who periodically trains employees how to avoid sexual harassment can be found to have exercised reasonable care to prevent sexual harassment. *Id.*

The second element of the affirmative defense is shown with evidence that an employee was informed of reporting procedures and failed to take advantage of those procedures. *Id.* The second element may also be shown by evidence that an employee unreasonably delayed reporting sexual harassment. *Pinkerton*, 563 F.3d at 1064 (ruling that employer was entitled to assert affirmative defense because employee did not report sexual harassment until two months after the harassment began). *See also Christian v. AHS Tulsa Regional Medical Center, LLC*, No. 10–5020, 430 Fed. Appx. 694, **6 (10th Cir. July 15, 2011) (unpublished opinion) (affirming decision that employer proved affirmative defense by showing that plaintiff unreasonably delayed reporting sexual harassment for five months).

As an alternative to vicarious liability, an employer can be liable for its own negligence related to an employee's sexual harassment. To prove negligence, a plaintiff must show that the employer "failed to remedy or prevent a hostile of offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known."

13

*An*, 94 Fed. Appx. at 669.[6]  Under the negligence theory, an employer is liable for its negligence in allowing employees to engage in sexual harassment, but an employer is not liable if it takes appropriate remedial or preventative action reasonably calculated to end the harassment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (stating that an employer is liable if the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment) (citation omitted).

SWC argues that it should not be held vicariously liable for Senkevich's conduct because it meets the requirements of the *Farragher/Ellerth* defense.  Plaintiff counters that the affirmative defense is not available to SWC because the harassment from Senkevich culminated in a tangible employment action, constructive discharge.  In *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) the United States Supreme Court stated that "an employer is strictly liable for supervisor harassment that 'culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'" *Id.* (quoting *Ellerth,* 524 U.S. at 765; citing *Faragher,* 524 U.S. at 808).  The Supreme Court noted that constructive discharge may fall into the category of "tangible employment action." *See Suders*, 542 U.S. at 136-47.  Alternatively, the Supreme Court concluded that " when no tangible employment action is taken, . . . the employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take

_____

[6] This standard applies to liability for sexual harassment under the New Mexico Human Rights Act. *Nava v. City of Santa Fe*, 2004 -NMSC- 039, ¶ 6, 136 N.M. 647, 103 P.3d 571 (stating that to prove a sexual harassment hostile work environment claim, an employee must prove that the employer knew, or should have known, of the harassment and failed to take remedial action).

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 137-38.

2.  Can SWC Assert the *Farragher/Ellerth* Defense?

Plaintiff maintains that she was subjected to a tangible employment action because the conditions created by Senkevich were so abusive that she had not choice but to resign; therefore, she suffered constructive discharge.  Plaintiff contends that because she was constructively discharged, SWC cannot avoid strict liability for Senkevich's behavior.  Plaintiff argues she has proved she was constructively discharged with evidence that she received  unemployment benefits arguing that these benefits are only provided to employees who resign  "with good cause."  The receipt of unemployment benefits supports an inference that Plaintiff was justified in resigning from her employment at SWC.  However, constructive discharge requires much more than a justified resignation.  Plaintiff must prove that SWC's work conditions were "so intolerable that [Plaintiff had] no other choice but to resign." *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982).

The Court agrees with SWC that Plaintiff has not shown she was treated so abusively that she had no choice but to resign.  The test for "intolerable conditions" is an objective one.  *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007).  And, the burden of proof on constructive discharge is high. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).  *See Suders*, 542 U.S. at 147 (noting that a hostile environment constructive discharge claim entails something more than conduct that amounts to actionable harassment; a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign).  Plaintiff's evidence falls short of the proof required for constructive discharge.  *See Newland v. Stevinson Toyota East, Inc.*, 505 F. Supp. 2d 689, 699 (D. Colo. 2007) (stating that constructive

15

discharge requires "something more" than pervasive sexual harassment).  Consequently, SWC

may assert the *Farragher/Ellerth* defense to avoid vicarious liability for Senkevich's conduct.

### 3.  Has SWC Established the Two Elements of the *Farragher/Ellerth* Defense?

SWC must show that (1) it "exercised reasonable care to prevent and correct promptly

any sexually harassing behavior," and (2) Plaintiff "unreasonably failed to take advantage of any

preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Loya v. Wal-Mart Stores East, LP*, 669 F. Supp. 2d at 1284 (citations omitted).  In SWC's

Employee Handbook, which Plaintiff  received and acknowledged reading, SWC instructed its

employees not to engage in harassment and gave specific examples of inappropriate behavior.

(SWC's Employee Handbook, Mot. Ex. A-4 at 5.)  SWC also instructed employees how to

report harassment and offered different avenues for reporting if an employee did not want to

confront the employee's supervisor.  (*Id.*)  The policy clearly prohibits retaliation against alleged

victims of harassment. (*Id.* at 6.)  SWC has presented evidence that it followed its policy with

respect to Plaintiff's complaint about Senkevich's conduct.  After Plaintiff's June 6, 2011

complaint, SWC's Miller and Herrington immediately interviewed employees about Senkevich's

behavior with Plaintiff and took corrective action by separating Plaintiff from Senkevich, by

assigning two management employees to continue Plaintiff's training, and by directing

management employees to monitor the interactions between Senkevich and Plaintiff and report

further problems.  The Court concludes that SWC has met the first element of the

*Farragher/Ellerth* defense.

However, SWC has failed to establish the second element because SWC cannot show, as

an undisputed fact, that Plaintiff unreasonably failed to complain or unreasonably delayed in

complaining about Senkevich's harassment.  Plaintiff testified that she, ". . . complained about

Chance Senkevich to multiple management employees between February 14th, 2011 and June

6th, 2011." (Chavez-Acosta Aff. ¶ 12.)  Miller's affidavit testimony contradicts Plaintiff's

testimony: "On June 6, 2011, Chavez-Acosta approached me to complain about a co-worker,

Chance Senkevich" who was picking on Plaintiff, "not calling her by name, questioning her

ability to do her job, telling others that she was not good at her job, and sabotaging her work by

hiding gaskets that she needed for the machines."  (Miller Aff. Mot. Ex. B at ¶ 12.)  SWC's

evidence shows that during the time period between June 8-17, 2011, Miller investigated

Plaintiff's allegations.  In light of this conflicting evidence, SWC has failed to show, as a matter

of law, that Plaintiff unreasonably failed to complain about Senkevich's harassment.

As for Stewart's conduct, SWC has shown that Plaintiff failed to avail herself of its

complaint procedure.  Plaintiff testified that she did not report Stewart's behavior to Miller or

any other management employee. (Plaintiff's Dep. 62:25-63:3.)  However, Plaintiff alleges that

Miller was personally aware of Stewart's conduct of exposing his genitals two years before he

exposed himself to Plaintiff and that Miller took no action because Stewart was a friend of Eric

Denton, a Production Manager at SWC.  However, Plaintiff cannot defeat the *Farragher/Ellerth*

affirmative defense with evidence that the employer should have known despite Plaintiff's

failure to complain.

Plaintiff also argues that Miller failed to adequately investigate her allegations as an

excuse for Plaintiff's failure to report Stewart's conduct.  However, an employee's fear that

nothing would be corrected is an insufficient reason for failing to report sexually threatening

behavior. *Pinkerton*, 563 F.3d at 1063.  In light of SWC's express prohibition of retaliation

against employees who complain about sexual harassment, Plaintiff's failure to report Stewart's

conduct is particularly troubling. *See id.* (noting that if courts allowed an employee's subjective fear of retaliation to excuse an employee's reporting requirement, courts would "completely undermine Title VII's basic policy 'of encouraging forethought by employers and saving action by objecting employees.'") (citations omitted).

In sum, SWC may not assert the *Farragher/Ellerth* affirmative defense to avoid strict liability for Senkevich's behavior because Plaintiff has created an issue of fact as to whether she timely reported his conduct.  However, SWC may assert the *Farragher/Ellerth* affirmative defense to avoid strict liability for Stewart's sexual harassment.

> 4.  Is SWC Liable for Negligence With Regard To Senkevich's and Stewart's Conduct?

Vicarious liability is only one way in which an employer may be held liable for an employee's sexual harassment of another employee.  An employer is liable for its own negligence in causing or failing to stop sexual harassment.  To prove negligence, a plaintiff must show that the employer "failed to remedy or prevent a hostile of offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *An v. Regents of the Univ. of Cal.*, 94 Fed. Appx. at 669.  Plaintiff has presented evidence through her affidavit that as early as February 14, 2011, Plaintiff complained to management employees of Senkevich's conduct.  Since SWC's investigation of Senkevich's conduct did not begin until June 8, 2011, SWC may be liable under a negligence theory as well as under a vicarious liability theory.

As for SWC's liability for negligence related to Stewart's conduct, SWC contends that its management employees did not know and had no reason to know that Stewart exposed himself to Plaintiff or to other female employees at the SWC plant.  First, neither Plaintiff nor

18

Macias reported this behavior to their supervisors or to SWC management employees.  Second, although Plaintiff presented evidence that Stewart showed a picture of his exposed genitals to coworkers at a party in 2008, Plaintiff has failed to demonstrate how this behavior would place SWC's management on notice of Stewart's conduct at work.  Third, as for Macias' and Plaintiff's testimony that it was well known at SWC that Stewart had a propensity to expose himself , neither Plaintiff nor Macias have stated the basis on which they have knowledge of this fact and the testimony does not tend to prove that management knew of Stewart's propensity to act as he did.  Plaintiff has failed to create a fact issue as to SWC's actual or implied knowledge of Stewart's behavior.

### 5.   Conclusion On Hostile Work Environment Claims

Although this is a close case, there is disputed evidence that after Plaintiff rebuffed Senkevich's romantic offer on February 14, 2010, Senkevich verbally abused Plaintiff and sabotaged Plaintiff's work area thereby directly undermining Plaintiff employment status at SWC.   This evidence precludes summary judgment on Plaintiff's claims of sexual harassment resulting in a hostile work environment.  Because Plaintiff presented evidence that she timely reported Senkevich's conduct, SWC cannot use the *Farragher/Ellerth* affirmative defense to avoid vicarious liability for Senkevich's conduct.  As for Stewart's conduct, Plaintiff failed to report the conduct and thus, SWC is relieved of vicarious liability for his conduct.  In addition, SWC has proven it had no knowledge express or implied as to Stewart's conduct; thus, SWC cannot be held liable for negligence in failing to prevent or correct Stewart's conduct.

### C.   Claim for Intentional Infliction of Emotional Distress

New Mexico substantive law applies to this claim.  *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1222 (10th Cir. 2007).  To prove liability for this claim, a plaintiff must show that (1) the

conduct in question was extreme and outrageous; (2) the conduct was intentional or in reckless

disregard of the effects on the plaintiff; (3) the plaintiff's mental distress was extreme and

severe; and (4) there is a causal connection between the defendant's conduct and the plaintiff's

distress. *Trujillo v. Northern Rio Arriba Elec. Co-op, Inc.*, 2002 -NMSC- 004, ¶ 25, 131 N.M.

607, 41 P.2d 333.  To survive summary judgment on this claim, a plaintiff must show that the

defendant's conduct was  "so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community." *Id.   See also Rodriquez v. America Online, Inc.*, 183 F. Supp. 2d 1340,

1358-59 (D. N.M. 2001) (granting defendant summary judgment and holding that racial epithets,

threats of termination of employment, micro-management, more frequent discipline, and

reduction of plaintiff's stock award did not rise to the level required to assert a claim of

intentional infliction of emotional distress).

SWC correctly contends that the Court should dismiss Plaintiff's claim of intentional

infliction of emotional distress because Plaintiff's evidence, even if true, does not show that

SWC acted outrageously or intentionally, and Plaintiff has not presented evidence that she

suffered the type of severe emotional distress required for this claim under New Mexico law.

### D.  Claim for Negligent Supervision

New Mexico law applies to this claim. *Chavez v. Thomas & Betts Corp.,*396 F.3d 1088,

1099 (10th Cir. 2005) overruled on other grounds as recognized by *Semsroth v. City of Wichita,*

304 Fed. Appx. 707 (10th Cir. 2005).  An employer may be held liable for negligent hiring,

negligent supervision, or negligent retention of an employee even though the employer is not

vicariously liable for the employee's conduct. *Los Ranchitos v. Tierra Grande, Inc.*, 861 P.2d

263, 269 (N.M. Ct. App. 1993) (citing *Pittard v. Four Seasons Motor Inn, Inc.*, 688 P.2d 333,

339 (N.M. Ct. App. 1984)) (negligent hiring and retention constitutes alternative theory of liability against employer for employee's assault), *cert. quashed*, 685 P.2d 963 (N.M. 1984).  In order to support a claim for negligent hiring, supervision, or retention, there must be evidence that the offending  employee was unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and that the employer knew or should have known that the employee was unfit. *EEOC v. MTS Corp.*, 937 F. Supp. 1503, 1515 (D. N.M. 1996) (Hansen, J.).  To survive summary judgment on a negligent hiring, retention or supervision claim, an employee need only prove that the employer knew or reasonably should have known that an employee might cause some harm. *See EEOC v. University of Phoenix, Inc.*, 505 F. Supp. 2d 1045, 1063 (D. N.M. 2007) (noting that plaintiff frequently reported harassing conduct).

Since the *Farragher/Ellerth* defense prevents SWC's vicarious liability for Stewart's sexual harassment, the Court will analyze this claim as an alternative form of liability that could be imposed on SWC for Stewart's conduct.  However, the Court has held that Plaintiff may advance her sexual harassment claims based on Senkevich's conduct under the theory of vicarious liability, hence, the Court will not analyze this claim with respect to Senkevich's conduct.[7]  To hold SWC liable for negligent hiring, supervision or retention of Stewart, Plaintiff must show that SWC knew or should have known that Stewart exposed himself to Plaintiff or to female employees at SWC.

In her affidavit, Plaintiff testifies that after Stewart "sexually harassed" her, "I reported sexual harassment to Brenda Miller . . . but she did not take any action."  In her deposition,

---

[7] In addition, since SWC took immediate action upon learning of Senkevich's behavior, the Court would grant summary judgment on this claim on the merits.

Plaintiff testified that she did not report the incidents with Stewart to Miller. (Mot. Strike Aff. Ex. 1, Chavez-Acosta Dep. 62:25-63:3.)  SWC asks the Court to strike Plaintiff's statement in her affidavit because it contradicts her deposition testimony.  For this reason, the Court will strike this statement.  Macias also testified that Stewart exposed himself to her at work in June 2009, but Macias did not report it to management.  Therefore, Plaintiff has not brought forth evidence showing that SWC had actual knowledge that Stewart exposed himself to Plaintiff or to Macias.

As for SWC's implied knowledge, Plaintiff argues that SWC should have known of Stewart's propensity to expose himself based on the incident in November 2008 at a going away party for an intern.  At the 2008 party, Stewart photographed his genitals with the intern's camera, and the camera with the image was passed around the table.  Some management employees at the table viewed the image and made jokes.  SWC maintains that even though some management employees were present, the party was not an SWC event and the incident does not prove Stewart's propensity to expose himself at work.  Plaintiff and Macias have testified by affidavit that it was well known at SWC that Stewart exposed himself to women.  In her affidavit, Macias testified that she knew of Stewart's propensity, but Macias did not testify, nor could she, that management at SWC knew of Stewart's conduct.  SWC contends that the Plaintiff's testimony that "[i]t was well known" in the SWC plant that Stewart exposed himself to female employees is inadmissible because the statement cannot be based on Plaintiff's personal knowledge.  SWC contends that the basis for Plaintiff's knowledge presumably was hearsay from other employees, which would be inadmissible.  However, Plaintiff is not relaying hearsay because she is not testifying what someone "told" her about Stewart.  Instead, Plaintiff is stating "it was well known in the SWC plant . . ." that Stewart exposed himself.  Nevertheless,

Plaintiff does not provide a basis for knowledge that SWC's management employees knew of

Stewart's propensity to expose himself, and this statement will be stricken as not based on

Plaintiff's personal knowledge.  Plaintiff has not presented admissible evidence showing that

SWC's management should have known about Stewart's conduct of exposing himself to Plaintiff

or Stewart's alleged propensity for engaging in this conduct.  Due to lack of knowledge, either

actual or implied, SWC cannot be liable for negligent supervision or retention of Stewart as an

employee.  The Court will grant summary judgment on this claim.

### E.  Claim for Breach of Contract

New Mexico substantive law applies to this claim. *BancOklahoma Mortgage Corp. v.

Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).  In New Mexico, employment is

terminable at will absent an express contract to the contrary. *Sullivan v. America Online, Inc.*,

No. 06-2129, 219 Fed. Appx. 720, **2, (10th Cir. Feb. 12, 2007) (unpublished opinion) (citing

*Lopez v. Kline*, 953 P.2d 304, 306 (N.M. 1998)).  However, proof of an implied contract will

override the presumption of at-will employment. *Id.* (citing *Hartbarger v. Frank Paxton Co.*, 857

P.2d 776, 780 (1993)). "An implied contract is created only where an employer creates a

reasonable expectation" of continued employment. *Id.* (citing *Hartbarger*, 857 P.2d at 783).

When a plaintiff receives notice through an employer's handbook and application for

employment that her employment is "at will, " a plaintiff cannot prove an implied contract with

evidence of "vague statements from managers and policies within the handbook." *Rodriguez*,

183 F. Supp. 2d at 1356-57 . *See Sullivan*, 219 Fed. Appx. at **2 (holding that no implied

employment contract existed because employer's handbook stated that employee's status was at

will and also required written modification of an employee's at will status).

Plaintiff recognizes that the application, offer letter, and Employee Handbook state that

she is an at will employee.  However, Plaintiff contends that the at will arrangement was altered under an oral agreement that she would be terminated from her employment only for "just cause" after she completed the 90-day probationary period of employment.  SWC contends that all of its production employees were clearly informed in written materials that their employment was terminable "at  will."  SWC requires each employee to sign a statement acknowledging this fact.  The signed statement further provides that only the President of SWC can modify the nature of the relationship and only through a written contract.  (Miller Aff. ¶¶ 4-5.)  Plaintiff has failed to put forth any evidence that would support a finding that her employment was subject to an implied contract not to terminate her except for "good cause" after the 90-day probationary period.  Moreover, since Plaintiff resigned her employment and has failed to show that she was constructively discharged, Plaintiff cannot assert an injury related to a breach even if such an agreement existed.  Thus, Plaintiff's breach of contract claim fails as a matter of law. *See Rodriguez*, 183 F. Supp. 2d at 1356-57 (stating that when plaintiff received notice through defendant's employee handbook and application for employment that her employment was "at will" plaintiff could not base her breach of contract claim on vague statements from managers and policies within the handbook).

 IT IS ORDERED that DEFENDANT SOUTHWEST CHEESE COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 35):

 1.  Is denied as to Plaintiff's claims under Title VII and the New Mexico Human Rights Act for sexual harassment resulting in a hostile work environment.

 2.  Is granted on Plaintiff's claims for intentional infliction of emotional distress, breach

of contract, and negligent supervision, and those claims will be dismissed with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE